UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUBEN C. HOLTON, | : | No. 4:22-CV-70 |
| | : | |
| Plaintiff | : | (Saporito, J.) |
| | : | |
| v. | : | (Caraballo, M.J.) |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

### I.  Introduction

On January 13, 2022, plaintiff Ruben Holton, a former federal inmate previously housed at Federal Correctional Institution, Schuylkill ("FCI Schuylkill"), proceeding pro se, initiated this action pursuant to the Federal Tort Claims Act ("FTCA") against the United States of America and three of its employees, alleging tort injuries relating to medical treatment he received at FCI Schuylkill. Doc. 1. On March 11, 2025, the Court dismissed all but two of Holton's claims against the sole remaining defendant, the United States. Doc. 53. Those two claims allege that the United States was negligent, both professionally and ordinarily, in its treatment of Holton in February

2021 and thereafter, after he complained of Coronavirus disease 2019 ("COVID-19") symptoms, and eventually tested positive for COVID-19. Doc. 1 at 2–5.

The Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331. On July 25, 2025, the United States moved for summary judgment on both claims. Doc. 5. The motion is now fully briefed and ripe for decision, and was referred to the undersigned to issue the instant Report and Recommendation, pursuant to 28 U.S.C. § 636. As set forth below, the undisputed material facts show that Holton cannot establish certain elements of his claims. Accordingly, the undersigned recommends granting the United States' motion for summary judgment and dismissing the remaining claims with prejudice.

## II.   **Background**

### A. Relevant Procedural History

Holton was an inmate at FCI Schuylkill from March of 2018 to September 22, 2022. Doc. 33 at 3; Doc. 59 at 2. The facts underlying this action occurred "over a twenty-one day period in February and March of 2021. During this period, Plaintiff contracted Covid-19, and allegedly received inadequate treatment." Doc. 33 at 5.

2

Holton filed his operative complaint on January 13, 2022. Doc. 1. In addition to asserting professional and ordinary negligence claims against the United States, the complaint originally asserted claims against Bret Brosious, Ellen Liebson-Mace, and Mary Spiese, all of whom were medical professionals employed at FCI Schuylkill who treated Holton during February and March of 2021. *Id.* at 1–5.

The United States moved to dismiss the complaint on February 6, 2023. Doc. 24. In its motion, the United States contended that Holton failed to file a certificate of merit as required under Pennsylvania law, and thus failed to state a medical negligence claim, and that the Court lacked subject matter jurisdiction. Doc. 25 at 5–12.

In a Report and Recommendation filed on August 31, 2023, the Honorable William I. Arbuckle recommended that the Court deny the United States' motion. Doc. 33. Specifically, Judge Arbuckle concluded that the Court had subject matter jurisdiction over Holton's claims, and that Holton was not required to file a certificate of merit. *Id.* at 19–24. He likewise concluded that, in addition to a medical negligence claim, Holton also advanced an ordinary negligence claim. *Id.* at 23–25. Finally, Judge Arbuckle recommended *sua sponte* dismissal of

3

defendants Brosious, Liebson-Mace, and Spiese, because they were not proper parties under the FTCA. Doc. 33 at 25–26. On September 25, 2023, the Court adopted the Report and Recommendation and dismissed Brosious, Liebson-Mace, and Spiese from the action, but denied the United States' motion in all other respects. Doc. 34 at 2–4.

The United States answered the complaint on October 23, 2023. Doc. 37. On November 16, 2023, the United States moved for judgment on the pleadings. Doc. 40. In its motion, the United States contended that Holton's allegations were insufficient to plead all four required elements of a negligence claim: duty, breach, causation, and injury. Doc. 41 at 5. The United States specifically contended that "Holton has not alleged facts establishing a causal connection between the BOP's failure to administer COVID-19 tests on the one hand, and Holton's exposure to and contraction of COVID-19 on the other hand." *Id.*

In a Report and Recommendation filed on October 28, 2024, Judge Arbuckle recommended that the Court deny the United States' motion. Doc. 50. Judge Arbuckle concluded that the United States misconstrued Holton as asserting an ordinary negligence claim for failure to administer COVID-19 tests, when Holton actually asserted a medical

4

malpractice claim for such a failure. *Id.* at 14–15. Judge Arbuckle further concluded that the United States only addressed the injuries Holton allegedly suffered as a result of contracting COVID-19, and not the additional lingering and permanent injuries Holton allegedly suffered after contracting COVID-19. *Id.* at 16–17.

On March 11, 2025, the Court adopted the Report and Recommendation as modified. Doc. 53. Specifically, the Court dismissed those portions of Holton's claims alleging that his contraction of COVID-19 constituted an actionable injury, but declined to dismiss the allegations that he suffered injury from the development of prolonged and lingering COVID-19 symptoms. Doc. 52 at 14–25; Doc. 53 at 1. In addressing the claimed long-term injuries, the Court concluded that Holton "has pled sufficient facts to support his ordinary and professional negligence claims for his prolonged and permanent COVID-19 symptoms, and thus, we will deny the defendant's motion for judgment on the pleadings on this claim." Doc. 52 at 24. The Court emphasized that its ruling was premised solely on the allegations in the pleadings, noting that "[t]his holding, however, does not excuse the plaintiff's burden in proving the requisite elements of a medical

5

malpractice claim, including potential testimony from a medical expert to prevail on that claim. . . . Our holding, however, does not impact the potential viability of the defendant's contention that the plaintiff needs to present expert testimony to ultimately prevail on his claim." *Id.* at 24, n.9.

That historical litigation left Holton with two remaining claims now before the Court. First, in his professional negligence claim, commonly referred to as a medical malpractice claim, Holton alleges that FCI Schuylkill medical professionals had a duty to follow "generally accepted medical standards." Doc. 52 at 22; Doc. 1 at 5. He alleges that FCI Schuylkill medical professionals breached this duty when, during two medical visits on February 22 and 23, 2021, they failed to test him for COVID-19 after he complained of COVID-19 symptoms, and that this increased his risk of developing permanent and prolonged COVID-19 symptoms, which he subsequently developed. *Id.* at 3–5; Doc. 52 at 23.

Second, in his ordinary negligence claim, Holton alleges that FCI Schuylkill medical professionals had a duty to provide him with "suitable quarters and provide for" his "safekeeping [and] car[e],"

6

pursuant to Title 18, United States Code, Section 4042. Doc. 52 at 22; Doc. 1 at 5. He alleges that FCI Schuylkill medical professionals breached this duty when, during two medical visits on February 22 and 23, 2021, and during Holton's quarantine after testing positive for COVID-19 from March 3 to March 15, 2021, they failed to "properly and satisfactorily look into [] [his] complaint of Chest Pain/Difficulty Breathing," and that this increased his risk of developing permanent and prolonged COVID-19 symptoms, which he subsequently developed. *Id.* at 3–5; Doc. 52 at 23.

On July 25, 2025, the United States moved for summary judgment on these claims, and concurrently filed a statement of material facts. Doc. 58. In its motion, the United States contends that summary judgment should be granted in its favor on the professional negligence claim, because Holton cannot make a *prima facie* showing of medical malpractice without expert testimony. Doc. 60 at 10–12. For both the professional negligence and ordinary negligence claims, the United States contends that Holton cannot, on the record, establish breach of any duty of care, or that any breach caused his lingering symptoms. *Id.* at 12–15.

7

Holton filed a timely opposition, albeit without a counter statement of material facts, on August 20, 2025. Doc. 61. In his opposition, Holton counters that he has "successfully pled adequate facts to show a nexus between his lingering & permanent symptoms of COVID-19 and the Defendants alleged breaches." Doc. 61-1 at 3. He also avers that he can "make a Prima Facie showing of Medical Malpractice without an expert." *Id.*[1]

## B. Factual Background

Concurrent with its motion for summary judgment, and pursuant to Local Rule 56.1, the United States filed a statement of material facts with supporting exhibits. Docs. 58, 59. As detailed above, Holton has not submitted his own counterstatement of material facts. Holton has, however, attempted to oppose some of the United States' factual averments in his brief.

---

[1] Holton has a second, similar FTCA action pending before the Court. *See Holton v. United States*, No. 4:22-CV-487 (M.D. Pa. 2022). In that action, Holton asserts claims for ordinary and professional negligence based upon allegations that "medical professionals at FCI Schuylkill responded negligently to a variety of medical issues for which he sought treatment." *Id.* (Doc. 62 at 1). The United States also filed a pending motion for summary judgment in that action, where, as here, they contend that Holton failed to produce medical expert testimony, and that the evidence does not establish breach and causation. *Id.* (Doc. 51 at 10–31).

8

In this regard, Holton avers that, contrary to the United States' statement of facts, he "was Symptomatic during his March 2, 2021 COVID-19 Infection and was not checked on regularly during his time in isolation. Plaintiff also didn't have Minimal bibasilar March 2, 2021 COVID-19 infection." Doc. 61-1 at 2 (errors in original) (internal citation omitted). Moreover, Holton disputes the United States' characterization of some of his medical records, contending that while an expert report generated by the United States claims that he "did not report hallmark symptoms such as fatigue, cognitive dysfunction etc.," his records show that he did report these symptoms. *Id.* at 3. Finally, Holton also contests the expert report's conclusion that his respiratory "complaints may be confounded by his chronic asthma & tobacco use," saying that he never smoked a day in his life and that one of his clinical records from his time at FCI Schuylkill shows that, regarding his breathing problems, medical staff said, "recovery from Covid may take some time." *Id.* at 3–4.

This submission, however, is procedurally defective, because litigants who oppose a motion for summary judgment must submit their own statement of facts that responds directly and correspondingly to

9

the movant's statement of facts. M.D. Pa. L.R. 56.1. In the absence of such opposition, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted . . . ." *Id.* Furthermore, pro se litigants are required to follow the local rules equally with all other litigants. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (pro se litigants "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.") (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013)).

Accordingly, as Holton did not avail himself of the opportunity to submit a complete counterstatement of facts, those portions of the United States' statement of material facts and its accompanying exhibits that Holton did not directly refute are deemed unopposed and admitted. *See Liberty Bell Bank v. Rogers*, 726 F. App'x 147, 150–51 (3d Cir. 2018) ("Because [the defendant] neglected to file a responsive statement of material facts, the District Court was entitled to deem the statement of facts as admitted."); *Krushin v. Wolff*, 2023 WL 2472601, at *2–3 (M.D. Pa. 2023) (deeming the accompanying statement of facts admitted under Local Rule 56.1, for defendant's failure to respond).

As set forth in the United States' statement of material facts and its accompanying exhibits, prior to February of 2021 and since at least 2012, Holton underwent treatment for asthma. He likewise received treatment for an anxiety disorder since at least 2020. Doc. 59-3 at 31; 59-4 at 35–40, 48–50, 84–86, 138, 140–41, 146–47, 150, 152, 156. Additionally, the medical records submitted by the United States show that Holton was treated on numerous occasions during 2020 for various physical symptoms with a suspected connection to one or both of those underlying conditions. *Id.* at 146 ("Inmate Holton reported again that he is 'really not feeling good,' and endorsed various physical symptoms of anxiety, to include digestive problems/stomach upset, headaches, and muscle pain/tension. . . . [After consultation with Holton's other physician,] [s]he reported he has been examined on numerous occasions, and has continued to endorse additional symptoms, without apparent medical basis for these concerns.").

On March 17, 2020, while in Bureau of Prisons ("BOP") custody, Holton presented to sick call complaining of shortness of breath, headache, coughing, and diarrhea. BOP medical staff made normal examination findings, noting that Holton was not "acutely ill and in no

11

acute distress at this time[.]" *Id.* at 93–94. Holton returned to sick call on March 25, 2020, again complaining of shortness of breath and chest tightening, but reporting that his albuterol inhaler relieved his symptoms. *Id.* at 89. Staff noted no acute distress or illness and reinforced to Holton the importance of "proper inhaler use." *Id.* at 91.

Holton returned to sick call on June 30, 2020, again complaining of ear pain spreading to his jaw, neck, and sinuses. *Id.* at 73. Staff examined him and noted that his ear drums were "intact, bulging, air bubbles observed behind membrane" but that there was "[n]o obvious swelling, drainage, or erythema on section, not warm to touch." Staff also confirmed that "hearing appears intact." *Id.* at 75. Staff prescribed antibiotics and ordered an X-ray "to evaluate for mastoid pain." Staff otherwise recommended over-the-counter medications. Doc. 59-4 at 75.

Holton returned to sick call on September 16, 2020, where he reported complaints of nausea and chest pain. He reported that "[h]e doesn't want to go to work today because of his symptoms, and he also states that he hasn't had a day off yet this week." *Id.* at 41. His examination revealed no abnormal findings. *Id.* at 39. Holton returned to sick call the next day, September 17, 2020. *Id.* at 35. He complained

12

of chest pain, breathing problems, ear pain, stomach cramps, and other symptoms. Medical staff reminded Holton "that he ha[d] been seen for many of these complaints in HSU a number of times over the past year[.]" *Id.* His physician explained to Holton that his anxiety "can often cause symptoms similar to what he listed" and encouraged him to take his anxiety medication. *Id.* at 39.

On September 18, 2020, Holton had a psychiatric session where he "endorsed various physical symptoms of anxiety, to include digestive problems/stomach upset, headaches, and muscle pain/tension." *Id.* at 146. Psychiatry staff described Holton's presentation as "dysphoric" and noted that "inmate Holton appeared to be actively exaggerating symptoms, to include rubbing his eyes as though his vision was affected, rubbing his face/holding his head, tapping his ear as if he was having difficulty with his hearing/popping his ear, and at times rocking lightly in his chair as he described symptoms." Doc. 59-4 at 146. Prior notes taken by psychiatry staff on September 11, 2020, contained similar findings to those on September 18, stating that Holton "[d]emonstrates anxiety symptoms, evidence by physical symptoms of panic (e.g. racing heart, tight chest), worry, feelings for foreboding, and significant sleep

13

disturbances (e.g. nightmares, sleep paralysis, hypnogogic/hypnopompic hallucinations)." *Id.* at 151.

Holton presented again to sick call on October 8, 2020. *Id.* at 28. He complained of head and earaches. *Id.* Holton's evaluation revealed nothing abnormal. *Id.* at 30. Medical staff recommended acetaminophen for pain and Nasacort and Claritin for his sinus discomfort. *Id.*

Holton made an urgent visit to sick call on November 23, 2020, complaining of intense chest pain. *Id.* at 9–13. Medical staff performed an EKG on Holton, during which he "appeared in no acute distress. . . ." Doc. 59-4 at 11. The EKG revealed no abnormalities. *Id.* Holton presented to sick call again on November 29, 2020, with continued complaints of chest pain. *Id.* at 5. Medical staff performed another EKG, which again revealed normal findings. *Id.* at 6. Holton's vitals were also normal. *Id.* Nonetheless, the BOP sent Holton to an outside emergency room for further evaluation. *Id.* At the hospital Holton reported "left sided chest pain" that "is stabbing and aching in nature." *Id.* at 165. An EKG performed there was "normal." Doc. 59-4 at 166. Imaging studies performed at the hospital revealed "no specific evidence of active disease in the chest." *Id.* at 173.

14

On December 14, 2020, the BOP collected a specimen to test Holton for COVID-19, the results of which were negative. *Id.* at 160. This appears to be the first instance in the medical records in which Holton was tested for COVID-19.

In February 2021, Holton presented twice to sick call complaining of chest pain and breathing issues. These two visits form the factual core of Holton's claims. First, on February 22, 2021, Holton complained about "the same chest pain he was having before when he went to the hospital in November[]" 2020. Doc. 59-5 at 105. Medical staff reviewed those November hospital records with Holton, noting that the hospital found his chest pain to be musculoskeletal and that his EKG findings were normal. *Id.* For reasons that are unclear, Holton terminated this encounter before undergoing an examination or receiving any additional treatment. *Id.* The following day, February 23, 2021, Holton returned to sick call and complained of chest pain and difficulty breathing, explaining to staff that his "symptoms are the same as they always are." *Id.* at 103. Staff performed a general exam and an EKG, both of which showed no abnormalities. *Id.* at 103–04, 228. Holton was

15

discharged and told to return as needed and if his condition worsens. *Id.* at 104.

On March 3, 2021, the BOP tested Holton for COVID-19 because he was identified as a close contact with another inmate who had tested positive. Doc. 59-5 at 90. Despite Holton being asymptomatic, the test results came back positive. *Id.* As noted above, Holton refutes that characterization, claiming that he was symptomatic during the March 3, 2021, visit, but the medical records he offers in support of this assertion do not corroborate his claim. Doc. 61-2 at 1–5. Holton was then placed in isolation and prescribed acetaminophen. *Id.* at 91.

Although Holton avers that he was not checked on regularly while in isolation, Doc. 61-1 at 2, the evidence offered by the United States shows that FCI Schuylkill medical staff monitored Holton and took his temperature several times over the ensuing days. *Id.* at 116. On March 8, 2021, Holton first reported intermittent shortness of breath and a non-productive cough. *Id.* at 87. He denied fever and chest pain and had no additional complaints. *Id.* Upon examination, Holton's blood oxygen was normal, he was alert and oriented, and his lungs sounded clear bilaterally. *Id.* Over the next week, medical staff followed up with

16

Holton several times and noted that he was asymptomatic, leading to his release from isolation thereafter. *Id.* at 116.

Over the remainder of 2021, FCI Schuylkill medical professionals examined Holton several times. Across these visits, Holton complained of various symptoms, including breathing problems, eye problems, chest pain, diarrhea, dizziness, rapid heartbeat, sleep disturbances, and joint instability. Doc. 59-5 at 49–53, 55–59, 64, 73–75, 82–85, 153. As general examinations performed at these visits failed to corroborate the alleged severity of Holton's symptoms, he was discharged with instructions to manage his pain and without issue each time. *Id.* Throughout this period, medical records show that Holton continued to be treated for anxiety and asthma. *Id.* at 10–11, 18, 39, 59, 85, 149, 160, 192.

On February 8, 2022, Holton underwent an abdominal and pelvic computed tomography scan. Among other things, it revealed "small bilateral pleural effusions" (fluid in lungs) and "[m]inimal bibasilar atelectasis" (collapsed lung). Doc. 59-6 at 154–55, 164–65, 172–73. Holton was infected with COVID-19 a second time on July 26, 2022, and recovered within ten days without developing any significant symptoms. *Id.* at 10, 90.

17

On May 19, 2025, the United States deposed Holton. Doc. 59-3 at 1. In in his deposition, Holton clarified that the "pain of mind and body" COVID-19 injuries he referenced in his complaint referred to partially collapsed lungs with fluid buildup, asthma, deteriorating eyesight, and "mental strain"—*i.e.*, worsening depression, anxiety, and sleep disturbances. Doc. 59-3 at 14–16, 21. Holton also confirmed that he was originally diagnosed with asthma around 2012, and acknowledged that no medical professional has ever attributed his anxiety or vision problems to his 2021 COVID-19 infection. *Id.* at 31, 35–36. Holton testified that his vision problems were caused by his COVID-19 infection because his vision "started getting blurred after" it, and he claimed that "Dr. Bybel" at FCI Schuylkill explained that his collapsed lung was a byproduct of his COVID-19 infection. *Id.* at 17–20. Finally, Holton claimed that a surgeon who operated on him for a hernia recommended in December of 2021 that he be put on "some water pills" for the fluid buildup in his lungs. *Id.* at 24–25.

On June 24, 2025, defense expert Kenneth Rictor, M.D., generated a report premised on his review of Holton's medical records, allegations, and deposition testimony. Doc. 59-8 at 2. In his report, Dr. Rictor

concluded that clinical records showed that Holton's alleged injuries did not "align with the typical diagnostic framework for Long COVID." *Id.* at 14. As explained by Dr. Rictor, the typical diagnostic framework of Long COVID includes symptoms such as fatigue, dyspnea or shortness of breath, chest pain or palpitations, sleep disorders, cognitive disturbances known under the umbrella term "brain fog," anxiety or depression, myalgias or joint pain, and autonomic dysfunctions such as postural tachycardia syndrome. *Id.* at 10–12.

Dr. Rictor found Holton's alleged injuries inconsistent with the above symptoms, saying that

> The delayed findings of a partially collapsed lung and pleural effusion nearly a year after infection are not consistent with common pulmonary sequelae observed in Long COVID, which tend to manifest within 3–6 months post-infection and are often preceded by severe or hospitalized illness. Furthermore, his pre-existing diagnosis of asthma, history of anxiety, and age-related visual changes are more plausible explanations for the symptoms he attributes to Long COVID.

> The symptoms Mr. Holton later attributed to long COVID— specifically a partially collapsed lung, pleural fluid, poor eyesight, and 'mental strain'—do not match the most common or clinically accepted long COVID presentations. His asthma was pre-existing, and the 2022 CT findings do not temporally correlate with his 2021 COVID-19 illness. There is no longitudinal clinical evidence linking these pulmonary findings to sequelae of COVID-19.

19

*Id.* at 14.

Thus, Dr. Rictor ultimately concluded that "the available scientific and clinical data support the conclusion that Mr. Holton's complaints are unrelated to COVID-19 and attributable to baseline comorbid conditions such as asthma or anxiety, and not representative of long COVID syndrome." *Id.* at 15. Continuing his analysis, Dr. Rictor further concluded that, contrary to Holton's allegations,

> The Bureau of Prisons met the standard of care in diagnosing and managing Mr. Holton's COVID-19 infection in early 2021. Available treatment options were provided, and his symptoms remained mild. No therapies known to reduce long COVID risk were omitted. His later complaints, reviewed above, are not medically attributable to the COVID infection based on current evidence. Therefore, there is no clinical basis to conclude a causal link between the 2021 COVID-19 infection and his reported lingering symptoms.
>
> Mr. Holton's mild COVID-19 illness in March 2021 was managed appropriately according to national standards. His post-illness complaints do not conform to long COVID criteria, and no medical evidence establishes a probable causal link between his 2021 COVID-19 infection and later symptoms such as partial lung collapse, poor eyesight, or anxiety.
>
> Therefore, it is my opinion, to a reasonable degree of medical certainty, that:
> 1. The BOP met the standard of care in evaluating and managing Mr. Holton's COVID-19 infection.
> 2. No viable therapeutic options were omitted that could have altered the course of his illness.
> 3. Mr. Holton does not exhibit clinical evidence of long COVID.

20

4. His reported ongoing symptoms are more likely attributable to chronic co-morbidities or unrelated conditions rather than sequelae of COVID-19.

*Id.* at 18. Holton does not offer any rebuttal expert report.

## III. Discussion

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate only when record materials, including but not limited to, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); Fed. R. Civ. P. 56(a), (c)(1)(A). In determining whether a genuine issue of material fact exists, the court must view the evidence "in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Wishkin*, 476 F.3d at 184.

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material only if it "might affect the outcome of the suit under the

21

governing law . . . ." *Id.* But "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including but not limited to] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* " '[T]he non-moving party must [then] oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.' " *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Even where, as here, the movant argues that the non-movant has failed to produce sufficient evidence to prevail on a claim at trial, the

22

movant must still satisfy the initial burden of informing the court of the basis for its motion. *Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[.]"). This means that "[w]here the moving party does not have the burden of proof on the relevant issues," and they have pinpointed in their motion "deficiencies in the opponent's evidence" sufficient to show no reasonable jury could return a verdict for the non-movant, they are entitled to "judgment as a matter of law." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990).

### B. Holton's Negligence Claims Under the FTCA

As previously construed by the Court, Holton's complaint advances claims for medical malpractice and ordinary negligence under the FTCA. Doc. 1 at 1, 4–5. The FTCA is a limited waiver of sovereign immunity that authorizes suits against the United States

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Essentially, the FTCA renders the United States "liable to the same extent as a private party for certain torts committed by federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976).

The FTCA "does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal United States in federal court." *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 362 (3d Cir. 2001). As such, FTCA claims require that courts "apply the law of the state in which the act or omission occurred." *Hodge v. United States Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir. 2010) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000)). Thus, because the conduct giving rise to Holton's claims occurred at FCI Schuylkill, which lies within the Middle District of Pennsylvania, Pennsylvania state law applies to his claims.

### 1. *Medical Malpractice Claim*

The United States seeks summary judgment on Holton's medical malpractice claim on the premise that he failed to obtain the expert testimony necessary to establish a *prima facie* claim under

24

Pennsylvania law. Doc. 60 at 7–10. Holton contends in rebuttal that he can make a *prima facie* showing of medical malpractice without an expert, because "[t]he Court stated in it's March 11, 2025 decision that, a reasonable factfinder can find the defendants alleged failure to 'properly [and] satisfactorily look into [the plaintiff's] complaint of Chest Pain/Difficulty Breathing' increased the risk of permanent [and] prolonged symptoms." Doc. 61-1 at 3 (errors in original). As the record confirms that Holton has not produced the requisite expert testimony, and cannot avail himself of the narrow exception to that requirement, summary judgment on the professional negligence claim is warranted in the United States' favor.

Under Pennsylvania law, medical malpractice, or medical negligence, is defined as "the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood v. Owen J. Rogal, D.D.S., P.C.,* 824 A.2d 1140, 1145 (Pa. 2003) (citing *Hodgson v. Bigelow,* 7 A.2d 338 (Pa. 1939)). It is not enough in medical malpractice cases to prove the existence of an injury. *Mitchell v. Shikora,* 209 A.3d 307, 315 (Pa. 2019).

Rather, for a party to prevail in a medical malpractice action, it must "establish the defendant owed a duty of care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d. 502, 506 (Pa. 2009) (citing *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998)). Plaintiffs bear the burden of proof on these elements by a preponderance of the evidence. *Rippee v. Grand Valley Mfg. Co.*, 762 F.2d 25, 27 (3d Cir. 1985).

Critically, "to state a *prima facie* case of medical malpractice, a plaintiff must provide a medical expert who will testify as to the applicable standard of care (i.e. the duty) that the physician owed the patient, that the physician breached that standard or duty, and that the breach was the proximate cause of the harm suffered." *Miville v. Abington Mem'l Hosp.*, 377 F.Supp.2d 488, 490–91 (E.D. Pa. 2005). Pennsylvania law delineates the necessary qualifications to offer an opinion as a medical expert in a malpractice action, providing that:

> **(a) General rule.**—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the

additional qualifications set forth in this section as applicable.

**(b) Medical testimony.**—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.

40 P.S. § 1303.512.

"The only exception to the requirement of expert testimony in medical malpractice cases applies where the matter is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons." *Miville*, 377 F. Supp. 2d at 491 n.2 (citing *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997)). This "very narrow exception" only applies, however, "when the physician's failure is clear even to a non-professional[,]" meaning that the conduct and harm at issue must be so egregious that they fall well outside the bounds of "a simple mistake of judgment,

27

failure of treatment, or an accidental occurrence." *Brown v. Hahnemann Univ. Hosp.*, 20 F. Supp. 3d 538, 542–43 (E.D. Pa. 2014).

As previously construed by the Court, Holton's medical malpractice claim is premised on the contention that the medical professionals at FCI Schuylkill owed Holton a duty to abide by "generally accepted medical standards." Doc. 1 at 5; Doc. 52 at 6, 23. He avers that this duty was breached when medical professionals at FCI Schuylkill failed to test him for COVID-19 during his two medical visits on February 22 and February 23, 2021, when he complained of COVID-19 symptoms. *Id.*; Doc. 1 at 3–5. Holton, moreover, alleges that this purported breach increased his risk of developing lingering and permanent COVID-19 symptoms, which he claims he later developed. *Id.* at 5; Doc. 52 at 23.

A review of the nature of Holton's claim, coupled with the evidence of record, concludes that the testimony of a medical expert is necessary here to determine the precise contours of the alleged breach and purported causation. The evidence shows that FCI Schuylkill medical professionals rendered medical treatment to Holton on the dates in question, *see* Doc. 59-5 at 103–05, and therefore, that they owed Holton

28

a duty of care to adhere to acceptable professional medical standards. *See Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x. 938, 944 (3d Cir. 2007) (concluding that, where medical treatment has been rendered, medical malpractice claims ask whether that treatment "violated acceptable professional standards[.]") (quotations omitted).

By contrast, the record is devoid of competent evidence establishing that these medical professionals breached acceptable professional medical standards by not testing Holton for COVID-19. A review of Holton's deposition reveals that he made a single potential reference to an alleged breach of the duty of care owed to him by FCI Schuylkill's medical professionals, testifying that he suffered mental strain as a result of "[p]retty much the things that I went through when I had COVID, far as, like not getting the adequate treatment that I may have thought I deserved." Doc. 59-3 at 21. It is unclear whether that testimony specifically referenced Holton's medical visits in February 2021, or whether the treatment sought was a COVID-19 test.

Even construing that testimony in Holton's favor, however, no expert opinion in the record supports his contention that failing to test him for COVID-19 was a breach of a professional duty. Moreover,

29

Holton's testimony alone is insufficient to create a genuine, material factual dispute, because he does not possess the qualifications necessary under Pennsylvania law to testify before a factfinder on the subjects of professional medical duty and breach. *See Maresca v. Mancall*, 135 F. App'x. 529, 531 (3d Cir. 2005) ("In the absence of such [expert] testimony, the District Court was bound to grant judgment as a matter of law in the Defendants' favor."); 40 P.S. § 1303.512.

Furthermore, the expert testimony exception does not apply here, because "the conduct at issue constituted an integral part of rendering medical treatment, and involved" complicated, multi-faceted medical questions involving "diagnosis, care, and treatment by a licensed professional[.]" *Paige v. Holtzapple*, 2009 WL 2588849, at *4 (M.D. Pa. 2009). Thus, to avoid a factfinder employing "conjecture, surmise[,] or speculation" to determine if the conduct at issue breached a professional medical duty, *Toogood*, 824 A.2d at 1145, Holton was required to produce his own supporting expert testimony. His failure to do so precludes him from succeeding on his medical negligence claim. *See Maresca*, 135 F. App'x. at 531 ("In the absence of such [expert]

30

testimony, the District Court was bound to grant judgment as a matter of law in the Defendants' favor."); 40 P.S. § 1303.512.

Even if a material issue existed for breach, Holton's medical malpractice claim would not survive summary judgment on causation. The record is devoid of competent evidence establishing that FCI Schuylkill medical professionals' failure to test Holton for COVID-19 in February 2021 caused his alleged lingering injuries. Rather, the only competent evidence in the record on the subject of causation lies in the expert report authored by Dr. Rictor on behalf of the United States.

Dr. Rictor's expert report refuted the allegations of causation in Holton complaint, opining that "[t]he symptoms Mr. Holton later attributed to long COVID—specifically a partially collapsed lung, pleural fluid, poor eyesight, and 'mental strain'—do not match the most common or clinically accepted long COVID presentations." Doc. 59-8 at 14. Rather, Dr. Rictor found that "[Holton's] pre-existing diagnosis of asthma, history of anxiety, and age-related visual changes are more plausible explanations for the symptoms . . . ." *Id.* Dr. Rictor thus concluded that, "no medical evidence establishes a probable causal link between [Holton's] 2021 COVID-19 infection and later symptoms such

31

as partial lung collapse, poor eyesight, or anxiety[,]" and "to a reasonable degree of medical certainty, that" "[Holton's] reported ongoing symptoms are more likely attributable to chronic co-morbidities or unrelated conditions rather than sequelae of COVID-19." *Id.* at 18.

The competing evidence in the record arises from Holton's deposition testimony and record evidence that he highlights. Holton testified that "Dr. Bybel" at FCI Schuylkill explained that his collapsed lung was a byproduct of his COVID-19 infection. Doc. 59-3 at 17–20. Holton, however, does not offer any testimony from Dr. Bybel. Thus, Holton's testimonial statement that Dr. Bybel explained that Holton's collapsed lung was a byproduct of his COVID-19 infection is not competent evidence of causation. As Holton would need to offer this out-of-court statement into evidence at trial to "prove the truth of the" causal matter it asserts, and because Dr. Bybel is the declarant, the statement is hearsay under Fed. R. Evid. 801. Hearsay, cannot be considered at the summary judgment stage, unless the "nonmoving party explains that it can be produced in an admissible form at trial." *Travillion v. Wetzel*, 2025 WL 971669, at *3 (3d Cir. 2025) (citing *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231,

32

238–39 (3d Cir. 2016)). Thus, because Holton has failed to explain how this hearsay statement can be produced in admissible form at trial, it "may not be considered for purposes of summary judgment." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).

Holton also testified that COVID-19 caused his vision problems, because his vision "started getting blurred after" his COVID-19 infection. Doc. 59-3 at 17–20. He further cites portions of the record that the undersigned construes as attempts to refute Dr. Rictor's expert opinion on the issue of causation.

First, Holton disputes Dr. Rictor's conclusion that medical records do not show that Holton exhibited hallmark Long COVID symptoms "such as fatigue, cognitive dysfunction etc." Doc. 61-1 at 3. In response, Holton highlights medical records from 2021 that he contends show he suffered from such hallmark symptoms. *Id.* And indeed, a review of the 2021 medical records Holton cites to shows that, in at least one instance on July 22, 2021, FCI Schuylkill medical staff found that Holton reported the "hallmark" Long COVID symptom of fatigue. Doc. 61-2 at 23.

Second, Holton disputes Dr. Rictor's conclusion that Holton's respiratory "complaints may be confounded by his chronic asthma & tobacco use." Doc. 61-1 at 3. Holton counters this conclusion by asserting that he has "never smoked a day in his life," and he flags medical records from 2021 that he contends show that his respiratory complaints were a result of COVID-19. *Id.* Again, a review of these records shows that, in at least one instance on March 26, 2021, FCI Schuylkill medical staff noted in an encounter with Holton that he was "aware that recovery from COVID" and building his respiratory capacity back up for exercise purposes "may take some time." Doc. 61-3 at 1.

But neither Holton's testimony concerning his blurry vision, nor the medical records he cites, are accompanied by any interpretive expert testimony that directly refutes Dr. Rictor's conclusion that Holton's injuries were not caused by his COVID-19 infection, as required under 40 P.S. § 1303.512. Thus, this evidence shows only that Holton's vision "started getting blurred" sometime after his COVID-19 infection, and, likewise, that Holton was reported as having fatigue and a diminished respiratory capacity sometime after his COVID-19

34

infection. Even viewed in the light most favorable to Holton, however, this evidence only establishes correlation with Holton's COVID-19 infection, not that his injuries of a collapsed lung, pleural fluid, poor eyesight, and 'mental strain,' were *caused* by his COVID-19 infection; the precise analysis for which expert testimony is required. *See Maresca*, 135 F. App'x. at 531. Accordingly, Holton has not "overcome his own hurdle in order to withstand the motion for summary judgment." *D.E.*, 765 F.3d at 268.

Although Holton seeks to survive summary judgment by leveraging the Court's decision on the United States' motion for judgment on the pleadings, Doc. 52, that reliance is misplaced. Claiming that he can make a *prima facie* showing of medical malpractice without expert testimony, Doc. 61-1 at 3, Holton cites the Court's statement that "a reasonable factfinder could find the defendant's alleged failure to properly & satisfactorily look into [the plaintiff's] complaint of Chest Pain/Difficult Breathing increased the risk of permanent and prolonged symptoms[,]" and that "[t]he plaintiff has pled sufficient facts to support his ordinary and professional negligence claims for his prolonged and permanent COVID-19

35

symptoms[.]" Doc. 52 at 23–24. What Holton overlooks, however, was the Court's emphasis that its ruling was premised solely on the allegations in the pleadings, and forewarning that its "holding . . . does not excuse the plaintiff's burden in proving the requisite elements of a medical malpractice claim, including potential testimony from a medical expert to prevail on that claim. . . . [and] does not impact the potential viability of the defendant's contention that the plaintiff needs to present expert testimony to ultimately prevail on his claim." *Id.* at 24 n.9. Holton fails to carry that burden here, despite having been put on notice that expert testimony was potentially integral to pursue his claim past the pleadings stage.

Accordingly, as Holton has not offered any expert evidence to create a genuine issue of fact concerning his professional negligence claim, and no reasonable factfinder could find that the United States committed medical malpractice based on the existing record, summary judgment is warranted.

### 2. *Ordinary Negligence Claim*

The United States requests summary judgment on the grounds that there is insufficient record evidence to support a finding that its

conduct breached an ordinary duty of care. Doc. 60 at 9–13. In the alternative, the United States avers that Holton cannot establish through record evidence that any breach caused an increased risk of long-term COVID-19 complications. *Id.* at 13–15. Holton contends in rebuttal that he has "successfully pled adequate facts to show a nexus between his lingering [and] permanent symptoms" of COVID-19 and the United States' conduct, claiming that "[g]eneral delays in treatment for illnesses can certainly embody causation for injuries separate from the illness itself[.]" Doc. 61-1 at 3. As the record evidence does not evince a disputed issue concerning whether prison staff breached a duty of care, summary judgment is warranted in the United States' favor.

Under Pennsylvania law, a plaintiff must prove the following elements to establish a *prima facie* claim for negligence: "(1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the harm in question; and (4) the plaintiff incurred actual loss or damage." *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 27 (Pa. 2006). The plaintiff bears the burden of proving these elements by a preponderance of the evidence. *Rippee,* 762 F.2d at 27.

37

As previously construed by the Court, Holton's ordinary negligence claim is premised on two interrelated contentions. First, that the staff at FCI Schuylkill owed Holton a duty to provide him with "suitable quarters [and] provide" for his "safekeeping[] [and] car[e]" pursuant to 18 U.S.C. § 4042. Doc. 1 at 5; Doc. 52 at 6–7, 23. Second, that this duty was breached when medical professionals at FCI Schuylkill allegedly failed to "properly and satisfactorily look into" his "complaint of Chest Pain/Difficultly Breathing" during his medical visits on February 22 and 23, 2021, and during his subsequent quarantine after testing positive for COVID-19 from March 3 to 15 of 2021. *Id.*; Doc. 1 at 3–5. Holton, moreover, alleges that this purported breach increased his risk of developing lingering and permanent COVID-19 symptoms, which he claims he later developed. *Id.* at 5; Doc. 52 at 23.

The duty at issue is set by federal statute, which provides that the United States has a duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise[.]" 18 U.S.C. § 4042(a)(2). Thus, as a federal prisoner at FCI

38

Schuylkill, the United States owed Holton a duty of "ordinary diligence to keep [him] safe from harm." *Hossic v. United States*, 682 F.Supp. 23, 25 (M.D. Pa. 1987); *Balter v. United States*, 2014 WL 1365905, at \*26 (M.D. Pa. 2014) ("The duty of care as provided by 18 U.S.C. § 4042 is that of ordinary diligence to keep prisoners safe from harm.") (internal quotations omitted).

In his claim, Holton alleges that medical professionals at FCI Schuylkill breached this duty of ordinary diligence when they failed to sufficiently evaluate his complaints of chest pain and difficulty breathing on February 22 and 23, 2021, and during his subsequent quarantine after testing positive for COVID-19 from March 3 to 15 of 2021. Doc. 1 at 3–5. "Courts of the Third Circuit, in *limited circumstances*, have recognized that certain acts or omissions by prison medical staff can constitute a breach of an ordinary negligence duty." *Grundowski v. United States*, 2012 WL 1721781, at \*6 (M.D. Pa. 2012) (emphasis added). The recognized limited circumstances have included prison staff failing to treat an inmate's diabetes, *see id.* at \*10; prison staff denying an inmate their prescribed medication, *see Jones v. United States*, 91 F.3d 623, 625 (3d Cir. 1996); prison staff failing to treat an

39

inmate for dental problems, *see Hill v. Lamanna*, 2006 WL 2433773, at *9 (W.D. Pa. 2006); and prison staff failing to schedule an inmate for necessary medical treatment in a timely fashion, *see Aviles v. United States*, 2012 WL 3562370, at *6 (E.D. Pa. 2012). In other words, general failures to provide or provide access to medical treatment that do not "involve an issue of medical judgment," the latter of which lie appropriately in medical malpractice claims. *Grundowski*, 2012 WL 1721781, at *6.

A review of the record finds insufficient evidence for a factfinder to conclude that the United States' conduct breached its duty under 18 U.S.C. § 4042. Record evidence corroborates Holton's claim that he was examined by FCI Schuylkill medical staff on February 22 and 23 of 2021 for both chest pain and difficulty breathing. Doc. 59-5 at 103–05. Additionally, record evidence confirms that at least once during Holton's isolation for COVID-19, he complained to medical staff that he had intermittent shortness of breath. *Id.* at 87.

The record also reveals, however, that Holton underwent examinations for these complaints, except for his February 22, 2021, visit, when Holton instead elected to terminate the encounter with

40

medical staff before an examination could be conducted. *Id.* at 105. The two examinations that Holton underwent, conducted on February 24, 2021, and March 8, 2021, show that although Holton complained of difficulties breathing and chest pains, his vital signs were normal, such as his heart rate, temperature, oxygen saturation level, and his lung sounds. *Id.* at 87–88, 103–04. Furthermore, an electrocardiogram ("EKG") taken on February 24, 2021, showed unremarkable findings. *Id.* at 104, 228.

Notwithstanding these exam results, Holton contends that staff should have done more for him, and that their corresponding failure constitutes breach. In particular, Holton testified that "[p]retty much the things that I went through when I had COVID, far as, like not getting the adequate treatment that I may have thought I deserved." Doc. 59-3 at 21. Holton does not, however, offer any record evidence, and the undersigned has not identified any, showing that prison medical staff failed to provide Holton with medical treatment, or delayed any necessary medical treatment.

To the contrary, record evidence shows that, on the relevant dates where Holton complained of chest pain and difficulties breathing,

41

medical staff, when allowed the opportunity, examined Holton and treated him for his complaints. Doc. 59-5 at 87–88, 103–04. On February 22, 2021, when Holton complained about "the same chest pain he was having before when he went to the hospital in November[]" 2020, medical staff reviewed the hospital records with Holton, noting that the hospital found his chest pain to be musculoskeletal and that his EKG findings were normal, before he ended the encounter. *Id.* at 105. The following day, when Holton again complained of chest pain and difficulty breathing, medical staff performed a general exam and an EKG, both of which showed no abnormalities. *Id.* at 103–04, 228. Medical staff thereafter recommended that Holton continue taking his medications and seek further treatment if his condition worsened. *Id.* at 88, 104.

Similarly, while Holton remained in quarantine following his positive COVID-19 test in March 2021, medical staff monitored him and took his temperature several times over the ensuing days. Doc. 61-1 at 116. On March 8, 2021, when Holton reported intermittent shortness of breath and a non-productive cough, medical staff conducted an examination, finding that Holton's blood oxygen was normal, he was

alert and oriented, and his lungs sounded clear bilaterally. *Id.* at 87. Over the next week, medical staff followed up with Holton several times and noted that he was asymptomatic, leading to his release from isolation thereafter. *Id.* at 116.

Nothing in the record evinces any refusal to administer, or delays in administering medical treatment, and Holton does not identify any evidence corroborating his claims. *Id.* Nor does he explain, through evidence or otherwise, how the treatment he received was flawed or delayed, or what additional treatment he should have received, but did not. At most, Holton offers only his deposition testimony, in which he claimed that he did not receive "adequate treatment," and that an unspecified time, he did not receive "diuretics . . . water pills for the fluid in the lungs." Doc. 59-3 at 21, 23. That testimony, bereft of any corroborating medical records, cannot create a disputed issue of fact in consideration of the medical evidence provided by the United States that refutes any claimed breach of duty.

Indeed, Dr. Rictor's expert report concluded that, even if Holton had required additional COVID-19 treatment, staff had no ability to provide it for him, because "[a]s of early 2021, no preventive therapies

43

had been validated to mitigate the risk of Long COVID in asymptomatic or mild cases. Accordingly, the care provided by the BOP did not deviate from standard practice . . . ." Doc. 59-8 at 15.

Here, the evidence of record shows that Holton received consistent treatment from prison medical staff in response to his complaints. Although Holton concludes that this treatment was inadequate, the record contains no evidence corroborating his claims. Holton thus has failed to demonstrate a disputed issue of material fact concerning whether the United States breached its duty of care. Accordingly, summary judgment on Holton's ordinary negligence claim is warranted in the United States' favor.[2]

---

[2] As the undersigned recommends granting summary judgment on the element of breach, there is no need to address the parties' contentions concerning causation. That said, the causation inquiry may well present a disputed issue of fact that cannot be determined on summary judgment. The United States relies on Dr. Rictor's opinion that Holton's injuries are incompatible with the medical condition known as Long COVID. *Id.* at 13–14. The United States also contends that record evidence evinces that Holton's preexisting asthma and anxiety are the causes of his claimed injuries. *Id.* at 14–15. In response, Holton offers both his competing testimony and medical records that show at least potential correlation, if not causation, between his COVID-19 infections and subsequent symptoms, including statements from FCI Schuylkill medical staff in March and July of 2021, indicating that Holton might suffer from Long COVID symptoms. *See* Doc. 59-3 at 17–20; Doc. 61-1 at 2–4; Doc. 61-2 at 23; Doc. 61-3 at 1. As expert testimony is not required for an ordinary negligence claim, Holton's evidentiary showing on causation indicates a disputed issue of material fact. *Jutrowski*, 904 F.3d at 289.

44

## IV.  <u>Recommendation</u>

For the reasons set forth above, it is **RECOMMENDED** that:

1.    The Defendant's motion for summary judgment (Doc. 58) be

     **GRANTED**, and all remaining claims and defendants be

     **DISMISSED WITH PREJUDICE**; and

2.    The Clerk's Office be **DIRECTED** to **TERMINATE** the

     United States of America as Defendant and **CLOSE** this

     case.

The parties are further placed on notice that pursuant to Local

Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the

45

record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

M.D. Pa. L. R. 72.3. The failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights. *See Nara v. Frank*, 488 F.3d 187, 194 (3d Cir. 2007).

Date: February 3, 2026              ***s/ Phillip J. Caraballo***
                                    Phillip J. Caraballo
                                    United States Magistrate Judge